# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

NAOMI W.,[1]

        Plaintiff,

v.                                                              Action No. 2:23cv332

MARTIN O'MALLEY,[2]
Commissioner of Social Security,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Naomi W. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 6. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's request for an award of benefits, or, in the alternative, request for remand (ECF No. 10) be **DENIED**, and the decision of the Commissioner be **AFFIRMED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

[2] Martin O'Malley is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See* 42 U.S.C § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

# I.     PROCEDURAL BACKGROUND

Plaintiff initially applied for SSI in October 2020.[3]  R. 18, 198–207.  Plaintiff alleges disability beginning July 22, 2019.  R. 18, 42, 198.  Plaintiff alleges disability due to blood clots, breathing issues, heart palpitations, lumbar surgery, and nerve damage.  R. 234.  After the state agency denied her claim both initially and on reconsideration, R. 66–72, 111–113, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), R. 116–17.  ALJ Monica Flynn held a telephonic hearing on October 18, 2022, R. 39–65, and issued a decision denying benefits on November 2, 2022, R. 18–33.  On May 15, 2023, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–7.  As a result, ALJ Flynn's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on July 11, 2023.  ECF No. 1.  In response to the Court's order, plaintiff filed a brief for the requested relief on October 23, 2023, ECF No. 10, and the Commissioner filed a brief in support of the decision denying benefits on November 22, 2023, ECF No. 11.  Plaintiff replied on December 4, 2023.  ECF No. 12.  As oral argument is unnecessary, this case is ripe for a decision.

# II.     RELEVANT FACTUAL BACKGROUND

Plaintiff presents three issues on appeal.  First, plaintiff argues that remand is required "because the ALJ failed to consider whether [plaintiff] was unable to work on a regular and sustained basis for any continuous period of 12 months due to a series of back surgeries."  Pl.'s Br., ECF No. 10, at 2.  Second, plaintiff contends that remand is necessary "because the ALJ failed

---

[3] Page citations are to the administrative record that the Commissioner previously filed with the Court.

to develop the evidence regarding [plaintiff's] mental impairments." *Id.* And third, plaintiff argues that the ALJ "failed to either adopt limitations she found credible in her residual functional capacity (RFC) or to explain why she was omitting these credible limitations." *Id.* at 3.

### A.   *Background Information and Hearing Testimony by Plaintiff*

Plaintiff, represented by counsel, testified by telephone before ALJ Flynn on October 18, 2022. R. 41–56. Plaintiff was born in October 1968 and was 50 years old as of her alleged onset date of disability in July 2019. R. 41, 43. Plaintiff testified that at the time of the hearing her height was 5'0" and her weight was 296 pounds. R. 54. Plaintiff previously worked at Sunrise Senior Living from 2005 to 2010 as a home health aide, Tidewater Community College from 2016 to 2018 as an administrator, and most recently at the Salvation Army from 2018 to 2019 as a front desk associate. R. 46–48, 211–19. At the time of the hearing, plaintiff was living with her husband, daughter, and sister. R. 48–49.

As to daily activities, plaintiff testified that she required assistance cooking and cleaning because she can only stand "about three to four minutes at a time" before her "left leg gives out on [her]." R. 49. Plaintiff also testified that she cannot do laundry because the washing machine and dryer are in her basement and she does not use stairs. *Id.* Plaintiff further testified that she recently started driving again prior to the hearing, but that she does not drive far "because of the spasms in [her] left leg." *Id.* She testified that she can lift and carry five to ten pounds two to three times before she will begin to feel pain in her back and leg. R. 52. Additionally, plaintiff testified that she has a walker that was prescribed by her doctor, but that she instead uses a cane daily because it allows her to "maneuver a little bit better . . . in the house."[4] R. 50. Plaintiff also testified that she resumed using the cane about a month or two before the hearing. R. 51. She further stated

---

[4] Plaintiff was not prescribed a cane.

that she is unable to work "because of the standing" and knowing that she "will have to walk from certain places." R. 51–52. Plaintiff also testified that "a lot of times [she] can't sit down for a long period of time," so she will lay down. R. 52.

In her most recent function report completed in December 2021,[5] plaintiff stated that she prepares daily meals, such as soup, frozen foods, sandwiches, and salads, while sitting down. R. 284. She cannot stand long enough to prepare a "full course meal" due to pain or numbness in her left leg. *Id.* Plaintiff also stated that she can iron as long as she is sitting down, and that she can "wash small dishes at times but ha[s] to lean on [the] sink," and needs help putting the dishes away. *Id.* She does not do yard or housework as it requires her to stand too long. *Id.* Plaintiff further noted that she leaves the house two to three times per week for doctor's appointments and church, and that she can go out alone, but has to use a walker or cane. R. 285. Additionally, plaintiff stated that she requires help putting on socks and shoes, as well as washing her back. R. 283. Plaintiff also indicated that she started wearing pads because she cannot hold her urine when the leg pain is particularly bad, which happens at least twice per day. R. 53.

Plaintiff also wrote that she does not have trouble following written or spoken instructions. R. 287. Nor has she had any trouble with authority figures or ever been fired or laid off due to issues getting along with people. *Id.* Plaintiff indicated that she does not handle stress well, but that she can handle changes in routine as long as she is given time. R. 288. In a third-party function report, plaintiff's friend supported her contentions. R. 245–54.

---

[5] Plaintiff previously completed a function report in January 2021, containing similar statements. R. 264–71.

**B.**     *Hearing Testimony by Vocational Expert*

Robert Lester, a vocational expert ("VE"), also testified at the hearing. R. 56–64. VE Lester testified that plaintiff has transferrable administrative skills from her past work "to include keyboarding, filing, reporting and recording, scheduling, and coordinating activities," which would be transferrable to both light and sedentary work. R. 57. VE Lester further testified that plaintiff has transferable skills in "accommodating" from her past work as a home health aide, which would transfer to light work as a companion. *Id.* In response to the ALJ's hypothetical[6], VE Lester testified that such a person could perform light work in the national economy, including past work as a front desk clerk, and light work by virtue of plaintiff's transferrable skills as a routine office clerk, post office mail clerk, and companion. R. 58–59. Moreover, VE Lester testified that plaintiff's transferable skills would allow her to perform sedentary work as an appointment clerk, data entry clerk, and clerical sorter. *Id.* In response to a second hypothetical[7], VE Lester testified that the individual would still be able to perform the identified administrative jobs at both the light and sedentary exertional level, but would no longer be able to perform light work as a companion. R. 62.

In response to plaintiff's attorney's question about the use of a cane, VE Lester testified that the hypothetical individual would no longer be able to perform the light work identified if using a cane in the dominant hand for ambulation. R. 63. In response to plaintiff's attorney's

---

[6] The hypothetical prescribed an individual in her early 50's with more than a high school education and past semi-skilled work who is limited to a light exertional capacity and the following limitations: (1) occasional climbing, stooping, kneeling, crouching, and crawling; and (2) frequent balancing. R. 59–60.

[7] The hypothetical prescribed that the individual, with the same limitations from the first hypothetical, would now need to "alternate between standing and sitting and walking and sitting so that for every 10 to 15 minutes of standing or walking they're going to need to sit down for 5 to 10 minutes." R. 61. The individual would be off-task an additional 5% of the time due to the alternating between positions. *Id.*

question about increased bathroom use, VE Lester testified that "[i]f such a limitation impacted productivity to a level unacceptable to the employer, which would be typically loss of productivity 15 percent or greater, it would preclude work." *Id.*

## C.   *Relevant Medical Record*

### 1.   *Plaintiff's Lumbar Surgeries and Treatment for Back and Neck Pain*

In or before July 2018[8], plaintiff presented to Tidewater Physicians Multispecialty Group Coastal Internal Medicine ("TPMG") for lumbar back pain, among other things. R. 695–702. Plaintiff reported that the pain started in July 2015, and that it caused difficulty walking. R. 696. Between July 2018 and July 2019 plaintiff met with Margaret Gaglione, M.D., her primary care provider, on five occasions. R. 664, 672, 680, 688, 695. Throughout that time period, plaintiff was prescribed several medications for back and neck pain, including Lyrica, Medrol, Ultram, and Cymbalta.[9] R. 664, 688. On March 7, 2019, Dr. Gaglione wrote in her assessment that she planned to refer plaintiff to an allopathic and osteopathic physician for lumbar surgery. R. 672.

In May 2019, on referral from Dr. Gaglione, plaintiff presented to Paul Mitchell, M.D., at Neurosurgical Associates for an evaluation of low back pain, as well as hip and lower extremity pain. R. 362, 477. Plaintiff indicated that the pain started in the back and radiated down to the hip. *Id.* Plaintiff reported that the pain stopped at the hip on her right side, but radiated down to her ankle in her left leg. *Id.* Plaintiff further noted that her left leg was weak, and that she had tried physical therapy, two steroid injections, and various medications without relief. *Id.* Plaintiff

---

[8] The record indicates that plaintiff had been prescribed medications for back and neck pain as far back as May 2018, *see, e.g.*, R. 698, but the first documented encounter in the record appears to be July 2018, R. 696.

[9] The record also indicates that plaintiff was previously prescribed gabapentin, which did not improve her pain, and that she has had two epidural steroid injections that did not provide lasting improvement. R. 696.

also reported having neck and left upper extremity pain and numbness that was getting worse, and that she wanted to have surgery if necessary. *Id.*

On initial examination, Dr. Mitchell noted: "[Plaintiff] is not in acute distress. Tenderness to palpation in the back, limited range of motion." R. 365. Dr. Mitchell further noted that plaintiff has normal strength in all tested muscle groups, normal sensation to light touch, and a positive straight leg raise bilaterally. *Id.* An MRI of plaintiff's lumbar spine showed "grade 1 L4–5 spondylolisthesis with moderately severe stenosis. She also has a left L5–S1 HNP." *Id.* Dr. Mitchell recommended lumbar surgery based on his findings. *Id.* Dr. Mitchell also noted that an MRI of plaintiff's cervical spine revealed "[s]everal levels of degenerative findings along cervical spine, most notably at C4–5 and C5–6. No significant spinal stenosis, although there is minor cord contact/flattening . . . [and] moderately severe right C5–6 foraminal stenosis; potential for right C6 nerve impingement." R. 366. Dr. Mitchell opined that, although these results explain plaintiff's neck and upper extremity symptoms, he did not yet recommend cervical spinal surgery and instead wanted to first try more conservative treatment methods. *Id.*

On July 22, 2019, Dr. Mitchell performed a lumbar laminectomy and fusion on plaintiff.[10] R. 1040. Post surgery, Dr. Mitchell noted that there were no complications, that plaintiff was "doing well, [had] expected post [operation] back pain, [and that her] leg feels better." R. 1041–42. Plaintiff's condition was noted as stable, and she was awake and alert with her motor and sensory functions grossly intact. R. 1042. The next day plaintiff was fit for and delivered a lumbar-sacral orthosis ("LSO") brace. R. 1043. On July 24, 2019, however, plaintiff reported

---

[10] The full description of the operation performed was: "Partial L3 laminectomy, L4–5 and L5–S1 decompressive laminectomy, L4–L5 and L5–S1 posterior lumbar interbody fusion, L4–L5 and L5–S1 posterolateral arthrodesis, L4–L5 and L5–S1 pedicle screw fixation, local graft, allograft, bone marrow aspirate from the hip, BMAC pheresis, stealth guidance." R. 1040.

"increased left leg pain and numbness with ambulation yesterday." R. 1049. For the next 10 days, plaintiff remained at the hospital, continuing to report headaches and left leg pain. R. 1050–94.

On August 3, 2019, Dr. Mitchell performed a "reexploration of lumbar wound for repair of CSF leak and redo L5-S1 laminectomy, partial diskectomy, partial removal and reinsertion of hardware (crosslink)." R. 1098–99. Dr. Mitchell noted that there were no complications during the procedure and that plaintiff's condition had improved afterwards, but that she had continued pain in her left lower extremity from the knee down. R. 1100. On August 6, 2019, plaintiff reported feeling much better, but still had "tooth ache pain in left leg from knee to ankle," as well as decreased sensation and tenderness to palpation in the same area. R. 1130. On August 9, 2019, plaintiff was discharged. R. 1180. She was provided a rolling walker, recommended home health therapy, and prescribed a variety of medications.[11] R. 1175, 1178–79.

On August 17, 2019, plaintiff again presented to Norfolk General Hospital with her chief complaints being headaches, back pain, and left leg numbness. R. 850. She reported that the headaches did not begin until August 15, although she had continued leg weakness and numbness from her left knee to ankle since discharge. R. 852. She also reported back spasms and chills since August 15, 2019, and stated that her home health nurse directed her, after discussion with the on-call doctor filling in for Dr. Mitchell, to present to the emergency department for further evaluation of her symptoms. *Id.* MRI lumbar spine results showed that there was "increased fluid collection at the L4 laminectomy site w[ith] thecal sac impingement." R. 878. Based on these results, Dr. Mitchell performed a reexploration of plaintiff's lumbar wound and evacuation of

---

[11] Plaintiff was taking the following medications on August 9, 2019: cyclobenzaprine, diltiazem, docusate sodium, ergocalciferol, gabapentin, heparin, insulin, methylprednisolone, metoprolol, NS, polyethylene glycol, and vancomycin. R. 1178.

hematoma on August 21, 2019.[12]  R. 941–42.  Dr. Mitchell noted after the surgery that there were

no complications.  R. 942.  On August 28, 2019, plaintiff was discharged.  R. 1019.  At the time

of discharge, she was prescribed Percocet for pain and a walker.  *Id.*

At a two-week, post-surgery follow-up with Dr. Mitchell in September 2019, it was noted

that plaintiff's leg pain improved, that she had no straight leg raising pain, and that her motor

strength was 5/5.  R. 539.  On October 10, 2019, she reported to Dr. Mitchell for a six-week follow-

up.  R. 537.  Plaintiff indicated that she was doing okay and still had some distal left leg pain but

only when she lied down.  *Id.*  Dr. Mitchell also noted that for about a week prior to follow-up

plaintiff had been complaining of "left flank pain," although it was not associated with her back.

*Id.*  On November 19, 2019, plaintiff reported that she was experiencing left distal lower extremity

irritating pain from about the shin down.  R. 535.  Although it was not constant, plaintiff stated it

was worse when she was lying down, although she was actively experiencing it while sitting.  *Id.*

Plaintiff also noted that her right leg was fine, and that she still had postoperative back pain.  *Id.*

Dr. Mitchell wrote that plaintiff would start physical therapy as she "tapers out of her brace."  *Id.*

During the same time frame, plaintiff also had post August-2019 surgery follow-ups with

Dr. Gaglione.  On September 24, 2019, plaintiff reported that she was "no longer having the back

pain but pain in leg is terrible."  R. 657–58.  On October 14, 2019, plaintiff continued to report left

leg pain from the knee down, R. 649–50, but on October 24, 2019, plaintiff reported that she was

improving and "able to do more," R. 642–43.  About a month later, plaintiff again noted that she

was improving, and stated that she was ready to start out-patient therapy, although she was not

---

[12] The full procedure performed on August 21 included:  "Reexploration of lumbar wound, evacuation of hematoma, L3, redo L4 decompression from L2 through S1, posterolateral arthrodesis, L3 through S1 pedicle screw fixation, local graft, allograft, bone marrow aspirate (hip and pedicle), stealth guidance."  R. 941.

cooking due to an inability to stand. R. 635–36. By December 30, 2019, plaintiff reported that her lumbar back pain was "improving but still present," and also noted that she still had left leg pain. R. 627. She also stated that she was still wearing her back brace when she is out, she was using a "rollator," her walking remained limited, and she was taking Gabapentin and Flexeril. *Id.* At follow-ups on February 19 and April 23, 2020, plaintiff continued to report that her back pain was improving, and that she was using a cane, although her walking was still limited. R. 607, 609, 616, 618.

In February 2020, plaintiff met with Dr. Mitchell for a six-month, post-surgery follow-up. R. 2253. Dr. Mitchell noted that plaintiff still had a "fair amount of back pain and no change in her distal left lower extremity irritating numbness pain." *Id.* Dr. Mitchell further indicated that a CT scan showed loosening of the "left L3 pedicle screw," no evidence of severe canal stenosis, and "[m]oderate bilateral neural foraminal narrowing at L4–L5 and moderate right neural foraminal narrowing at L5–S1." *Id.* Moreover, Dr. Mitchell noted that he prescribed SI joint injections for low back pain management and that he was considering revision surgery "with larger screws at L2 and reinforcement of her posterior lateral fusion." R. 2253–54. On June 4, plaintiff presented for another follow-up and reported that the SI joint injection gave her significant relief but for only one day. R. 2245. Dr. Mitchell noted that a physical examination showed 5/5 muscular strength and "symmetric, decreased [range of motion] and palpable pain along the left SI joint." R. 2246.

On August 20, 2020, plaintiff presented to Dr. Mitchell for a one-year, surgery follow-up. R. 2244. Dr. Mitchell noted that plaintiff "did get significant relief although transient from her SI joint injections," but that he would schedule her for another SI joint fusion surgery. *Id.*

On December 23, 2020, Dr. Mitchell performed a "partial removal of old hardware, re-exploration of lumbar fusion, L3–4, L4–5 pedicle screws, L3–4, L4–5 PL arthrodesis, allograft BMA (Hip), BMAC and BMP, Stealth Guidance" operation on plaintiff. R. 2201, 2207–08. Dr. Mitchell noted that there were no complications and plaintiff experienced only expected post-operative back pain. R. 2208. Plaintiff was discharged on December 28, 2020. R. 2226–27.

At a follow-up exam two weeks later, plaintiff told Dr. Mitchell that she was doing well, that her back felt better, and that "even her left leg fe[lt] better." R. 2172. A physical examination also showed that plaintiff had no straight leg raising pain and that her motor strength was 5/5. *Id.* On February 9, plaintiff again reported that she was doing well and still had no left leg pain and just some numbness. R. 2171. However, on March 23, plaintiff reported some pain over the right SI joint and a physical examination showed a decreased range of motion and palpable pain over the right SI joint. R. 2170.

In April 2021, on referral from Dr. Mitchell, plaintiff began rehabilitative therapy at Greenbrier Therapy Center. R. 2166–69. Plaintiff's general assessment showed "impaired gait and posture, decreased lumbar [range of motion], decreased [left lower extremity] strength, and impaired endurance and functional mobility." R. 2167. Plaintiff reported that she used a cane for ambulation, had just been taken out of a back brace per Dr. Mitchell, still had a lot of pain with bending, and that "sometimes her [left lower extremity] feels like it will give out on her, which is limiting her standing and walking tolerance." R. 2168. She further reported that her current standing and walking tolerance was less than five minutes. *Id.*

By her sixth rehab therapy session in May 2021, plaintiff was assessed to have responded well to therapy and noted a decrease in lower back pain. R. 2164. It was also noted, however, that plaintiff still has "some stiffness and altered sensation in [her lower back] and [left lower

11

extremity] which sometimes [a]ffects her walking ability, especially when she first stands up." R. 2164–65. On June 3, plaintiff's therapy general assessment indicated that she was making "slow but steady progress with therapy, however ongoing [lower left extremity] pain/numbness. [Plaintiff] has been able to progress to standing core stabs, however fatigues very quickly. [Plaintiff] still unable to tolerate supine core stabs, but has been able to progress well in sitting." R. 2160.

On June 24, 2021, plaintiff presented to Dr. Mitchell for a six-month, post-surgery follow-up. R. 2155. Dr. Mitchell noted that plaintiff was not doing well, and she complained of back pain radiating down her left lower extremity from her knee to her foot. *Id.* A month later, at a therapy session on July 12, however, plaintiff was noted to have a decrease in symptoms and was able "to perform repeated lumbar [extensions] in standing at wall today which abolished [left lower extremity] symptoms and did not aggravate [lower back]." R. 2154. Plaintiff further noted that her pain was a 3/10 from her left knee to ankle, but that she can only stand for a few minutes before she experienced leg pain. R. 2155. By July 29, plaintiff reported that she had some back soreness and reported a pain level of 6/10, but felt that she was getting better and "seeing improvement in her leg symptoms, back symptoms, and walking tolerations." R. 2152. On August 31, plaintiff noted "specific improvements in her ability to walk around the house, in stores, when shopping, etc. as a result of her exercises," and a pain rating of 4/10. R. 2149. In late September, a CT scan of plaintiff's lumbar spine showed that the hardware appeared to be well-anchored, her thecal sac was adequately decompressed, there was "good fusion," and "no evidence of instability." R. 1971, 2851. Moreover, on September 27, plaintiff had no complaints throughout her therapy session, reported that she was doing better, had been having less pain overall, and that her pain rating was 0/10. R. 2146–47.

12

By November 10, 2021, plaintiff's 55th and final therapy session, she reported "100% overall improvement" since beginning physical therapy, noted that certain exercises helped with decreasing the pain down into her leg, and stated that she was going to join the YMCA to continue with aquatics, which also helped with her pain. R. 2140–41. Plaintiff later reported during a November 30, 2021, office visit to TPMG that she was moving much better, no longer used a cane, and was able to walk around with a cart while shopping. R. 1790–91. She made a similar report in January 2022. R. 3071–72. In March 2022, plaintiff reported that her left leg was bothering her again and that she was using a cane and considering steroid injections, R. 3080–81, but by April 2022, she reported improvement after starting on steroids and Cymbalta, and noted that she was not using a cane, R. 3088–93.

### 2. *Plaintiff's Treatment for Mental Health*

In March 2019, plaintiff's primary care provider, Dr. Gaglione, diagnosed her with monopolar depression. R. 673. Dr. Gaglione's impression was that plaintiff's depression was "situational due to pain and back." *Id.* Plaintiff was prescribed Cymbalta, *id.*, but by July 2019, she was no longer taking it, R. 665. Then, beginning in February 2020, plaintiff was grieving the loss of her child. R. 589, 599, 608, 617. However, plaintiff reported that she was coping well and still completing activities of daily living. R. 589, 599–600, 608–09, 617. In November 2021, plaintiff was "very tearful," but noted that she had good resources and wanted to try Wellbutrin. R. 1792. By January 2022, plaintiff reported that her mood was stable and much improved with Wellbutrin. R. 3073, 3082, 3089. Moreover, plaintiff's mental status examinations consistently show that she exhibited an appropriate mood and affect, as well as normal insight and judgment. *See, e.g.*, R. 594, 603, 685, 692, 1796, 3093. Aside from medication prescribed by Dr. Gaglione,

13

plaintiff does not have any other treatment history in the record related to her depression and/or mental health.

### 3.     *Opinions of State Agency Experts*

In connection with plaintiff's physical residual functional capacity ("RFC"), Bert Spetzler, M.D., opined on initial review that plaintiff could: (1) occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; (2) stand and/or walk fours in a day; (3) sit for about six hours in an eight-hour workday; (4) occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; (5) and frequently balance. R. 71–72. Dr. Spetzler explained that plaintiff's exertional and postural limitations were based on, "MRI L spine reveals moderate foraminal stenosis at L4–L5 bilaterally with potential impingement of the existing L4 nerves," "CT scan LS spine degenerative changes, status post L3–S1 level postop changes including hardware fixation and posterior decompression," and "morbid obesity 317 lbs, BMI over 60." R. 72. Dr. Spetzler did not find plaintiff to have any manipulative, visual, communicative, or environmental limitations. *Id.* Further, Dr. Spetzler opined that:

> This claimant has DJD with operation for decompression and fusion with reexploration. Claimant continues to have complaints of pain and balance issues. Is marked morbid obesity with BMI greater than 60 is a significant contributing factor to deconditioning and stresses on the lumbar spine. A modified light RFC is appropriate.

*Id.* On reconsideration, Robert McGuffin, Jr., M.D., concurred with Dr. Spetzler's opinions. R. 80–85.[13]

---

[13] No state agency examiner reviewed plaintiff's mental impairments, but it was noted that "[n]o [mental] RFCs are associated with [plaintiff's] claim." R. 72, 84.

### III.    THE ALJ'S DECISION

To evaluate plaintiff's claim of disability, the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 416.920(a). The ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work given her RFC; and (5) was capable of engaging in any substantial gainful employment given her RFC. R. 20–33.

First, the ALJ determined that plaintiff had not engaged in substantial gainful activity since October 23, 2020, the application date. R. 20.

At steps two and three, the ALJ found that plaintiff's degenerative disc disease, status post-lumbar fusion, neuropathy, obesity, asthma, hypertension, obstructive sleep apnea, and deep vein thrombosis constituted severe impairments. *Id.* The ALJ classified plaintiff's other impairments as non-severe, noting that she considered even the non-severe impairments throughout the decision and when assessing the plaintiff's RFC. R. 20–22. Further, the ALJ determined that plaintiff's severe impairments, either singly or in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 22–24.

The ALJ next found that plaintiff possessed the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a). R. 24–31. The ALJ also specified the following additional limitations:

> She can occasionally climb, frequently balance, and occasionally stoop, kneel, crouch, and crawl. She needs to alternate between standing and sitting, and walking and sitting, such that for every 10–15 minutes of standing or walking, she needs to sit down for 5–10 minutes. She will be an additional 5% off-task due to switching positions, but otherwise, she can do the job sitting or standing.

15

R. 24.

At step four, the ALJ noted that plaintiff was unable to perform any past relevant work. R. 31. After reviewing the Dictionary of Occupational Titles ("DOT") and the VE's testimony, at step five the ALJ determined that plaintiff could perform existing jobs in the national economy, including working as an appointment clerk, data entry clerk, and clerical sorter. R. 32. Accordingly, the ALJ concluded plaintiff was not under a disability from October 23, 2020, the date the application was filed, through November 2, 2022, and was ineligible for SSI. R. 33.

## IV.   STANDARD OF REVIEW

In reviewing an ALJ's decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Johnson*, 434 F.3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if

supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.    ANALYSIS

Plaintiff presents three issues for review in pursuit of remand. Pl.'s Br. 2–3. First, plaintiff argues that the ALJ failed to consider whether plaintiff was unable to work on a regular and sustained basis for any continuous period of 12 months due to a series of back surgeries. *Id.* at 2. Second, plaintiff asserts that the ALJ failed to develop the evidence regarding plaintiff's mental impairments. *Id.* And third, plaintiff argues that the ALJ did not adopt, or explain why she chose to omit, credible mental limitations into her RFC. *Id.* at 3. The Court will address each argument in turn.

### A.    *Substantial evidence supports the ALJ's conclusion that plaintiff was not disabled throughout the relevant time period, including for any continuous period of 12 months therein.*

Plaintiff contends that the ALJ "erred in failing to consider whether [plaintiff's] series of lumbar surgeries would have rendered her unable to work for some continuous period of 12 months, even prior to October 2020." *Id.* at 5. Moreover, plaintiff argues that the ALJ "based her presumption of improvement largely on [plaintiff's] need to use an assistive device for ambulation." *Id.*

The Commissioner contends that the ALJ reasonably considered plaintiff's ability to work on a regular and continuing basis, including considering whether plaintiff was disabled for any 12-month period. Def.'s Br. in Supp. of the Acting Comm'r's Decision Denying Benefits and in Opp.

to Pl.'s Br. ("Def.'s Br."), ECF No. 11, at 13.  The Commissioner further asserts that the "ALJ closely considered [p]laintiff's medical history, including her history of back surgeries prior to the period of alleged disability." *Id.* at 14.

To qualify for disability benefits, plaintiff need only show that she was disabled for any consecutive 12-month period between her onset date and the date of the hearing.  20 C.F.R. § 416.905(a); *see Calhoun v. Colvin*, 959 F. Supp. 2d 1069, 1075 (N.D. Ill. 2013) ("the disability inquiry must be made throughout the continuum that begins with the claimed onset date and ends with the hearing date, much as though the ALJ were evaluating a motion picture at every frame of that time period instead of . . . a snapshot taken [at] the hearing.").  Moreover, although supplemental security income benefits are not payable prior to the application filing date, an ALJ must develop the plaintiff's complete medical history for at least the 12-month period preceding the month in which the application was filed.  *See* 20 C.F.R. §§ 416.335, 416.912(b)(1); *see also* POMS DI 25501.370(A)(1) ("Generally, the earliest possible [established onset date] in a title XVI claim is the application filing date or protective filing date.  However, we do consider the period before the filing date under certain circumstances, for example when determining if a claimant met the 12-month duration requirement.").

The ALJ properly evaluated plaintiff's medical history from prior to her application date in October 2020 through the hearing in November 2022, concluding that plaintiff "can perform a limited range of sedentary work as set forth in the established [RFC]."  R. 25–31.  Looking particularly at plaintiff's history of lumbar issues and surgeries, the ALJ noted that plaintiff "has had significant back problems, as well as neck problems," dating as far back as May 2019.  R. 26. The ALJ noted plaintiff's degenerative changes in her cervical and lumbar spine, radiculopathy particularly in her left leg, and the laminectomy and fusion surgery that plaintiff underwent in July

2019. *Id.* Further, the ALJ noted the complications plaintiff endured after her initial lumbar surgery, "including infection, hematoma, and CSF leak, leading to two more procedures in August 2019, including redo laminectomy and fusion." *Id.*

The ALJ went on to discuss plaintiff's ongoing lumbar-related health problems post-surgery in 2019. *Id.* The ALJ stated that "[a]fter her last surgery in August 2019, [plaintiff] developed pseudoarthrosis and had sacroiliac joint dysfunction," as well as "signs of active L4–L5 radiculopathy on the left." *Id.* (referencing Exhibits 2F, 3F, and 9F). The ALJ also noted that "[f]rom mid-late 2019 and into 2020, the [plaintiff] was using a walker," but "by April 2020, she no longer needed her walker and was using a cane." R. 23 (referencing Exhibits 1F, 4F, and 6F). Moreover, the ALJ discussed that "in December 2020, [plaintiff] underwent another back surgery including partial removal of old hardware, re-exploration of lumbar fusion, and L3–L4 and L4–L5 pedicle screw fixation and posterolateral arthrodesis." R. 26 (referencing Exhibits 2F, 5F, and 9F). After her December 2020 surgery, the ALJ again observed that plaintiff used a cane, as well as her postoperative limitations such as "no bending, no lifting greater than 5–10 pounds, and no twisting." R. 23, 30 (referencing Exhibits 2F, 3F, 5F, 8F, and 9F). However, while the ALJ acknowledged that these "restrictions were supported by the [plaintiff's] immediate postoperative condition and the records pertaining to that, [] they are not consistent with subsequent records in 2021 showing that the [plaintiff] experienced improvements following her December 2020 surgery." R. 30–31.

Looking onward, the ALJ found that "[w]ith respect to her back and neck, [plaintiff] has had some improvement since late 2020." R. 28. The ALJ remarked that medical records showed "improvements with Cymbalta in 2021 and 2022, suggesting that [plaintiff's] pain levels would not prevent her from performing the reduced demands of sedentary work." *Id.* (referencing

Exhibits 6F, 9F, and 10F). The ALJ also observed that a December 2020 physical exam showed that plaintiff had "normal muscle bulk and tone and 5/5 strength in the upper and lower extremities except for mild weakness in the left hip and knee." *Id.* Further, the ALJ commented, that although plaintiff had decreased sensation in her left foot in 2020, her sensation was otherwise intact, suggesting that plaintiff had "adequate mobility and physical function to perform sedentary work tasks with postural limitations and a sit/stand option." *Id.*

The ALJ further noted that plaintiff's "physical therapy records document improvements." R. 28. In January 2021, the ALJ observed that plaintiff was doing well, her back and left leg felt better, she had no pain with straight leg raising, her strength was 5/5, and she was "gradually increas[ing] her activity." *Id.* By August 2021 her functional outcome score had improved significantly and plaintiff "reported specific improvements in her ability to walk around the house, in stores, and when shopping." *Id.* (referencing Exhibit 8F). In September 2021, the ALJ commented that her back pain was not as severe, although she still had an aching leg and tightness. *Id.* (referencing Exhibit 6F). The ALJ also noted that a September 2021 CT scan and x-ray of the lumbar spine showed "well-anchored hardware," "good fusion," and "no evidence of instability." *Id.* (referencing Exhibits 6F and 8F). Additionally, the ALJ discussed plaintiff's October 2021 physical therapy records, which indicated "that she no longer had lower extremity symptoms just some low back pain and stiffness." *Id.* And, the ALJ observed that "[o]n discharge from physical therapy in November 2021, [plaintiff] reported 100% overall improvement," and that she was moving better and no longer used a cane. R. 23, 28 (referencing Exhibits 6F, 8F, and 10F). Despite plaintiff's contention that she was "significantly more limited by her impairments from July 2019 through November 2021," the ALJ adequately considered all relevant medical evidence within this time period in forming her conclusion. Pl.'s Br. 5.

Moreover, the ALJ found persuasive that plaintiff's most recent function report, completed in December 2021, "suggests she can perform sedentary-type tasks." R. 29. The ALJ noted plaintiff's self-report that she "could prepare sandwiches and salads while sitting down and could iron when sitting and wash small dishes while leaning on the sink." *Id.* (referencing Exhibit 9E). Also, the ALJ observed that plaintiff could drive, shop by phone and computer, pay attention for as long as she needed while sitting, and had no problems following directions. *Id.* Additionally, the ALJ noted that plaintiff had no difficulty using her upper extremities, and she was able to use her upper extremities to perform "fine and gross motor movements" and balance while ambulating. R. 23 (referencing Exhibits 9E and 12F). The ALJ further commented that a March 2022 exam showed normal gait, although plaintiff was using a cane, but by April 2022 plaintiff was not using a cane or other assistive device. R. 29 (referencing Exhibits 10F and 11F). And, the ALJ noted that the state agency medical consultants "found the [plaintiff] could perform a limited range of light work with stand/walk and postural limitations, which implies that the [plaintiff] could also perform sedentary work." *Id.* (referencing Exhibits 2A and 6A). The ALJ's conclusion is further supported by the VE's testimony that use of a cane in the workplace would only impact plaintiff's ability to perform light work, rather than sedentary work. R. 63. Based on the foregoing, the Court finds that the ALJ adequately considered all medical evidence relevant to plaintiff's lumbar impairments from July 2019 to November 2022.

To the extent plaintiff claims that the ALJ erred in failing to explicitly deny a closed period of disability, that argument fails. *See Atwood v. Astrue*, No. 5:11cv002-RLV-DSC, 2011 WL 7938408, at *6 (W.D.N.C. Sept. 28, 2011) (finding that the ALJ was not required to explicitly deny a closed period of disability where the ALJ explicitly determined that the claimant was not disabled from the alleged onset date through the date of the disability decision). In finding that

plaintiff was not disabled from her application filing date of October 2020, through the date of the decision, the ALJ implicitly found that plaintiff also was not entitled to a closed period of disability at any time during that time frame. R. 18, 33; *see Laws v. Astrue*, No. 3:08cv722, 2009 WL 3270770, at *7 (E.D. Va. Oct. 8, 2009) (holding the ALJ implicitly found that plaintiff was not entitled to closed period of disability because the ALJ found plaintiff was not disabled from the alleged onset date through the date of the decision). Moreover, the ALJ stated that she "considered the complete medical history consistent with 20 C.F.R. § 416.912," and acknowledged that a disability is defined as an "impairment[] . . . [that] can be expected to last for a continuous period of not less than 12 months." R. 18; *see Reid v. Comm'r Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."). Accordingly, the ALJ appropriately considered plaintiff's history of lumbar surgeries and substantial evidence supports the ALJ's decision that plaintiff possesses the RFC to perform sedentary work subject to certain restrictions.

**B.** *The ALJ did not err in failing to further develop the record as to plaintiff's mental health impairments, and in declining to incorporate related limitations into the RFC.*

Plaintiff also argues that remand is required because the ALJ failed to develop the record as to plaintiff's mental health impairments. Pl.'s Br. 6. Additionally, plaintiff contends that the ALJ failed to include credible mental health limitations in her RFC or explain why such limitations were omitted. Pl.'s Br. 8. The Commissioner argues that the ALJ's evaluation of plaintiff's mental impairments was proper, and that no need existed to further develop the record. Def.'s Br. 17–24.

1. **The ALJ had no need to further develop the record as to plaintiff's mental impairments.**

Plaintiff argues that the ALJ, having classified plaintiff's depression as a medically-determinable impairment, erred by not having a psychiatrist or psychologist review the record to offer an opinion "as to the severity and vocational impact of [plaintiff's] mental impairments." Pl.'s Br. 6–7. The Commissioner asserts that the "ALJ has the *discretion* to seek additional or clarifying information *if* the information already in her possession is insufficient to determine whether the claimant is disabled," and was thus not required to further develop the record if she found the evidence sufficient to make a determination. Def.'s Br. 22.

The determination of the RFC "is an agency-conducted administrative assessment that considers all relevant" medical and other evidence. *Caulkins v. Kijakazi*, No. 20-1060, 2022 WL 1768856, at *5 (4th Cir. June 1, 2022) (citing 20 C.F.R. § 416.945(a)(3)); *see also* 20 C.F.R. §§ 416.945(a)(3), 416.946(c)).[14]   The agency's responsibility is to "develop [a claimant's] complete medical history," upon which a determination about disability may be made. 20 C.F.R. § 416.912(a)(2), (b)(1). In some cases, the record is "insufficient" – that is, lacking the information needed to assess disability, or "inconsistent" – that is, "conflict[ing]," "ambiguous," or not "based on medically acceptable clinical or laboratory diagnostic techniques." 20 C.F.R. § 416.920b(b). Depending on the issues in any case, the agency "may" seek additional evidence, for example, by recontacting medical sources, seeking more information, or by ordering a consultative examination

---

[14] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 416.929(a), (c).

("CE"). 20 C.F.R. § 416.920b(b), (b)(2)(i)–(iv); *see also* 20 C.F.R. § 416.919a(b) (describing when a CE may be sought).

The regulations, however, only require an ALJ "to seek additional evidence or clarification if the ALJ cannot reach a conclusion about whether the claimant is disabled based upon the evidence in the case record." *Harper v. Saul*, No. 4:19-cv-01535-CMC, 2020 WL 6074164, at *8 (D.S.C. Oct. 15, 2020). To determine "whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contains sufficient evidence" to make a disability determination. *Loving v. Astrue*, No. 3:11cv411, 2012 WL 4329283, at *5 (E.D. Va. Sept. 20, 2012) (citation and quotation omitted).

Here, the record contained sufficient evidence to enable the ALJ to assess mental disability and no need existed to further develop the record. The ALJ assessed plaintiff's depression at step two by applying the psychiatric review technique ("PRT").[15] Upon acknowledging plaintiff's monopolar depression diagnosis in early 2019, the ALJ noted that her condition was "felt to be situational due to her pain and back issues." R. 21 (referencing Exhibit 4F). Moreover, the ALJ observed that she received "no significant treatment for it other than medication through her primary provider." *Id.* The ALJ also noted that in early 2020 plaintiff reported only mild depression, and although she was grieving over a deceased child, she was still able to perform activities of daily living. *Id.* (referencing Exhibits 4F and 6F). Moreover, the ALJ noted that plaintiff's mood improved in early 2022 with treatment, and that her mental status examinations

---

[15] The PRT requires an assessment of the plaintiff's degree of functional limitation in four broad functional areas: (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. § 416.920a(c)(3). The technique is used to determine severity of the limitation at step two and whether a listing is satisfied at step three. *Id.* § 416.920a(d). If it is determined that the claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, [the ALJ] will then assess [the claimant's] [RFC]." *Id.*

showed normal findings, including normal memory, intact comprehension, and normal insight, although plaintiff was tearful at times. *Id.* (referencing Exhibits 4F, 6F, and 10F). Additionally, the ALJ found persuasive that plaintiff's treatment records indicated she had normal judgment and appropriate mood and affect. R. 22 (referencing Exhibits 4F, 6F, and 10F). Based on these observations, the ALJ reasonably determined that plaintiff's depression was non-severe and did "not cause more than a minimal limitation in the [plaintiff's] ability to perform basic mental work activities." R. 21.

Moreover, the ALJ found persuasive that in plaintiff's function reports, she reported no problems getting along with others or interacting with authority figures. *Id.* (referencing Exhibits 6E and 9E). She further indicated that she went out alone, took care of her daughter with help from others, spent time with others, including her grandchildren, and went to church. *Id.* The ALJ also noted plaintiff's report that "she could pay attention as long as needed if she is sitting," that she had no problems following directions, and that she could drive, shop, and handle money. R. 22 (referencing Exhibit 9E). The ALJ further observed plaintiff's comments in her most recent function report, completed in December 2021, that "she cried a lot, held things in, and did not handle stress well," but also that "she could handle changes in routine as long as she was given time." *Id.* However, the ALJ also noted that in her January 2021 function report, plaintiff reported "that she handled stress ok and had no problems with changes in routine." *Id.* (referencing Exhibit 6E).

Based on this analysis, the Court finds the ALJ adequately analyzed the mental health evidence in the record in concluding that plaintiff's mental impairments do not create more than a minimal limitation in performing basic work activities, and that no need existed to seek more information. The ALJ noted plaintiff's depression diagnosis in early 2019, prior to the alleged

onset date, but found that plaintiff's mood improved with conservative treatment and medication, and that plaintiff otherwise received no other treatment for her condition. R. 21–22. Moreover, the ALJ relied on plaintiff's self-reporting that her conditions do not affect her ability to interact with others and stay on-task in a work setting, or her memory, concentration, understanding, or ability to complete tasks. *Id.* (referencing Exhibit 6E and 9E). Further, when asked why she was unable to work, plaintiff did not mention any reason related to her mental functioning. R. 51–52. Accordingly, the ALJ had no obligation to further develop the record with respect to plaintiff's mental impairments.

### 2. *The ALJ did not err by failing to account for plaintiff's mild limitation in adapting or managing oneself when determining the RFC.*

Because the ALJ found that plaintiff suffered from a mild limitation in adapting or managing oneself, plaintiff argues that the ALJ had a duty to either include this limitation into her RFC finding or explain why she declined to incorporate the mild limitation into plaintiff's RFC. Pl.'s Br. 8–17; Pl.'s Reply Br. ("Pl.'s Reply"), ECF No. 12, at 4–6. The Commissioner argues that the ALJ's discussion of non-severe impairments at step two was sufficient to permit meaningful judicial review, and that the ALJ was not compelled to account for any mild limitation in her RFC finding. Def.'s Br. 20–21.

Although plaintiff does not specifically request for the Court to conduct an analysis pursuant to *Mascio v. Colvin,* 780 F.3d 632 (4th Cir. 2015), *Mascio* must be considered in order to address plaintiff's argument. Pl.'s Br. 8–17. In conducting the RFC analysis, the Fourth Circuit has made clear that an ALJ must provide an adequate narrative discussion to allow for substantial evidence review. *See Thomas v. Berryhill*, 916 F.3d 307, 311–13 (4th Cir. 2019). In particular, the Fourth Circuit has ruled that an ALJ who finds that a claimant has a *moderate* limitation in concentration, persistence, or pace at step three must reconcile that finding with the RFC

26

determination. *Mascio,* 780 F.3d at 638. If the ALJ fails to include that discussion, remand is required. *Id.* Accordingly, upon finding such moderate limitations at step three, an ALJ must either: (a) include limitations in the RFC to account for the same; or (b) explain "why [the] moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in [the claimant's RFC]." *Id.*

The *Mascio* holding is limited, however, to *moderate* limitations of *concentration, persistence, and pace. Younger v. Berryhill,* No. 2:18cv182, 2019 WL 3432771, at *5 (E.D. Va. June 21, 2019), *report & recommendation adopted,* 2019 WL 3451305 (E.D. Va. July 29, 2019). *Mascio* did not hold that remand was necessary when the ALJ fails to account for merely *mild* limitations in adapting or managing oneself. *See Mascio,* 780 F.3d at 638. Nonetheless, plaintiff points to a Tenth Circuit case, holding that mild mental limitations in any area of functioning must be expressed in the RFC determination, or the ALJ must explain the basis for choosing not to incorporate such limitations. Pl.'s Br. 9; *see Wells v. Colvin,* 727 F.3d 1061, 1068–71 (10th Cir. 2013). Plaintiff also cited 31 other decisions, 29 of which are outside the Fourth Circuit, supporting her contention.[16] *See* Pl.'s Br. 11–15.

Notwithstanding those decisions, neither this Court nor the Fourth Circuit have, thus far, seen fit to extend *Mascio.* In *Younger,* 2019 WL 3432771, this Court ruled that *Mascio* does not

---

[16] Plaintiff cites only two cases within the Fourth Circuit to support her contention. Pl.'s Br. 13–14; *see Long v. Kijakazi,* No. 1:20-CV-201, 2021 WL 6618725, at *11 (N.D.W. Va. Dec. 28, 2021) *report and recommendation adopted,* 2022 WL 188152 (N.D.W. Va. Jan. 20, 2022) (holding that the ALJ erred in failing to assess the impact of her mild mental limitations on her ability to perform past relevant skilled work as a general duty nurse into the RFC findings, in light of the plaintiff's testimony during the hearing "about her concerns regarding her distractibility and ability to satisfy the mental and sensory requirements of the work"); *see also Shank v. Saul,* No. 3:20-CV-444, 2021 WL 2767063, at *8 (S.D.W. Va. June 11, 2021) *report and recommendation adopted,* 2021 WL 2744550 (S.D.W. Va. July 1, 2021) (holding that without an explanation as to why plaintiff's mental functional abilities did not warrant any mental RFC restrictions, the court could not conduct a meaningful review).

require a remand when the ALJ did not explain why mild limitations were not incorporated into the RFC. *Id.* at *5 (citing *Mascio*, 780 F.3d at 638). Although acknowledging contrary rulings by other courts, *Younger* ruled that, should a finding of mild limitations require further explanation by the ALJ, that is for the Fourth Circuit to decide. *Id.* This Court went further in a subsequent case, ruling that "there is no requirement under SSA Rules to include specific restrictions directed to mild limitations associated with [] non-severe impairments," and that Mascio has not "been extended to cases involving only mild mental limitations." *Camille B. v. Kijakazi*, No. 2:20cv262, 2021 WL 5179197, at *8 (E.D. Va. July 16, 2021) (holding that because the ALJ observed the plaintiff to be doing well, suffering no panic attacks, and responding well to prescribed medication, the ALJ's conclusion that the record only supported RFC limitations related to physical impairments, and not plaintiff's mild mental limitations, was supported by substantial evidence) (*vacated and remanded on other grounds*, *Brooks v. Kijakazi*, 60 F.4th 735 (4th Cir. 2023)) (vacated because of the appointments clause). In *Lori A.J. v. Kijakazi*, No. 2:22cv131, 2023 WL 3069394 (E.D. Va. Apr. 5, 2023), the Court similarly ruled that after finding plaintiff's mental impairments to be mild, non-severe, and not posing a significant limitation on plaintiff's ability to perform basic work activities, it was not error for the ALJ to "simply decide[] that no limitations were necessary to include in the RFC." *Id.* at *8.

As detailed above, review of the ALJ's decision firmly supports the conclusion that the ALJ included in the RFC all limitations she deemed necessary and supported by the record. *See* R. 22 (stating "I considered all of the [plaintiff's] medically determinable impairments, including those that are not severe, when assessing the [plaintiff's] [RFC]."). Based upon the facts of this case, nothing more was required. As a result, the ALJ committed no error in making her RFC determination, and her opinion is supported by substantial evidence.

## VI.    **RECOMMENDATION**

For these reasons, the Court recommends that plaintiff's request for an award of benefits, or, in the alternative, request for remand, ECF No. 10, be **DENIED**, and the decision of the Commissioner be **AFFIRMED**.

## VII.    **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
April 2, 2024